**The below described is SIGNED.**



**Dated: December 03, 2007**

_____
**JUDITH A. BOULDEN**
**U.S. Bankruptcy Judge**

_____

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: <br><br> DELMAR L. HINCKLEY, <br><br> Debtor. | Bankruptcy No.: 06-23336 <br><br> Chapter 7 |
| In re: <br><br> AMERICA FIRST CREDIT UNION, <br><br> Plaintiff, <br><br> v. <br><br> DELMAR L. HINCKLEY, <br><br> Defendant. | Adversary Proceeding No.: 06-2531 <br><br> Judge Judith A. Boulden |

### MEMORANDUM DECISION

Before the Court is Plaintiff America First Credit Union's (Plaintiff or America First) Complaint for Nondischargeability under § 523(a)(6) of the Bankruptcy Code based on Defendant Delmar L. Hinckley's (Defendant) alleged willful and malicious conversion of a 2002 Oldsmobile Bravada (Car or Bravada). The crux of this case involves certain events in January 2006 when one of two mutually exclusive things allegedly happened — either the Defendant

refinanced his loan with the Plaintiff on the Bravada to add in other debt with the new obligation still secured by the Bravada, or he paid off the loan with a combination of his own money and money loaned to him by his mother.

The Court received evidence and heard argument at trial and took the matter under advisement. The Court has now considered the evidence properly before it, has judged the credibility of the witnesses, and has made an independent inquiry into applicable case law. Now being fully advised, the Court hereby issues the following Memorandum Decision.

## I. FACTS

The Defendant opened a membership account with the Plaintiff in July 2005.[1] At some point thereafter, the Plaintiff financed a 1998 Dodge Durango through the Plaintiff[2] which ultimately served as a trade-in toward the Defendant's purchase of the Bravada on October 31, 2005.[3] The Plaintiff financed $10,673.78 of the $20,609.61 purchase price of the Bravada, and the Utah Certificate of Title issued on November 23, 2005 lists the Plaintiff as the sole lienholder on the Car.

In a separate transaction in December 2005, the Defendant deposited three money orders totaling $2,760 with the Plaintiff and wired that same amount to Ghana before payment was

---

[1] Account #2238746-8.

[2] Account #2238746-8.1. The three alleged vehicle loans at issue in this case are sequentially numbered subdivisions of the Defendant's main membership account number — 2238746-8.1, 2238746-8.2, and 2238746-8.3, respectively, for the Durango loan, the original Bravada loan, and the refinanced Bravada loan.

[3] Account #2238746-8.2.

stopped on the money orders because they were counterfeit. As a result, the Defendant's checking and savings accounts[4] were overdrafted by $2,734.96.

Beyond these undisputed facts with the exception of the Durango trade-in, the evidence and theories of the case presented by the parties differ substantially. The Plaintiff alleges the following. In order to pay off the checking and savings account overdraft and because enough equity existed in the Bravada, the Defendant refinanced the Car debt to roll in the overdraft amount with the entire new obligation of $13,195.72 remaining secured by the Bravada.[5] An Applicant Worksheet regarding the refinance transaction was begun by loan officer Tara Wright on January 6, 2006 based on information provided by the Defendant during a phone call with Ms. Wright. The Applicant Worksheet also includes a "REFI" notation in the Additional Debts section and a date-stamped comment from Ms. Wright that the Defendant wished to enter into such a transaction to resolve the overdraft issue. As part of that transaction, the old Car loan was to be paid off and the Defendant's only checking and savings accounts with the Plaintiff were to be closed.

The Defendant was supposed to come to the Plaintiff's Riverdale office on January 11, 2006 to sign the required paperwork consisting of a Loanliner Security Agreement, a Loanliner Open-End Plan Signatures form, and an Account Closure Form, but he did not actually come in until January 13. During the Defendant's only visit to the Plaintiff's Riverdale office during the relevant time period which occurred on January 13, Ms. Wright explained the true contents of the aforementioned documents to the Defendant before he signed them. The Defendant initialed a

---

[4] Accounts #2262363-1.9 and 2262363-1.1, respectively.

[5] Account #2238746-8.3.

change on the Open-End Plan Signatures form indicating his desire to add disability insurance to his refinanced loan, Ms. Wright went elsewhere in the office to recalculate the Defendant's monthly Car loan payments with the addition of disability insurance, and the Defendant initialed the corresponding changes on the Loanliner Security Agreement showing the addition of disability insurance and the increase in monthly Car loan payments from $238 to $252/month. The signed Loanliner Security Agreement and Loanliner Open-End Plan Signatures form have preprinted dates of January 11, but the Account Closure Form has a handwritten date of January 13. The Plaintiff's own records show that the refinance transaction was electronically posted — i.e., the old Car loan was paid off and the new Car loan was established — on January 11 based on the automatically generated loan forms and the anticipated date of the Defendant's signatures. Loan typist Rusti Myrup's comments about receipt of the signed documents including the addition of disability insurance are dated January 13, which she testified would only occur because the documents were actually signed on January 13.

The Loanliner Security Agreement indicates that the Bravada is serving as security for the refinanced loan and that the Defendant, among other things, "promise[d] not to sell or lease the property or to use it as security for a loan with another creditor until the advance is repaid." The Defendant also promised to allow no other security interests or liens to attach to the Bravada, to have the Plaintiff's security interest noted on the Car's title, and to notify the Plaintiff of any change in the address where the Car is kept. Failure to keep any promise in the Security Agreement constitutes an event of default and entitles the Plaintiff to take possession of the Car.

Due to Ms. Wright's error in failing to inform the Plaintiff's records department that the payoff of the old Car loan was part of a refinance transaction, the Plaintiff mistakenly released

the Bravada's title to the Defendant on January 31 even though the Bravada secured the Defendant's refinanced obligation. Two payments of $250 each were made on January 28 and February 28, respectively, with the first check made out to America First and stating in the memo line that it was for the February car payment with the Defendant's Car loan account number written thereafter.[6] The Defendant then transferred the title to his mother, and an Idaho title for the Bravada was issued on March 14, 2006 listing the Defendant's mother as the owner with no lienholders.

Only after a couple of missed payments did the Plaintiff realize its error at the end of May 2006 and begin contacting the Defendant about its resolution, which ultimately led to the Plaintiff obtaining a reissued Utah title on the Car dated June 2, 2006 and unsuccessfully attempting to repossess the Car through repo agent Casey Snyder in July 2006. According to Mr. Snyder, the Defendant drove the Car off his truck's wheel lift, popping the right rear tire and bending Mr. Snyder's lift in the process.[7] The Defendant then hit his apartment building with the Car's right front bumper, backed up slightly, and continued to drive away out of Mr. Snyder's sight. Based on Mr. Snyder's inspection of the Car in connection with the attempted repossession and his conclusion that the car was in very good condition before being damaged by the Defendant, Mr. Snyder retrojected the Car's value as $16,125 on the date of transfer to the Defendant's mother in March 2006. This bankruptcy case was subsequently filed on September

---

[6] The Car loan account number was written generically as 22387468, but only one vehicle loan account existed at the time — namely 2238746-8.3, the refinanced Car loan — and that was the specific account to which the payments were applied.

[7] The Plaintiff's Trial Brief states on page 2 that the repossession was attempted on September 11, 2006 (which would have been postpetition) and that the Defendant had two flat tires when he drove off, but there was no dispute at trial as to the July 2006 attempted repossession date or the existence of only one flat tire.

7, 2006. In the accompanying Statement of Financial Affairs, the Defendant did not list the transfer of the Car to his mother but did list a general unsecured debt of $13,197 owed to America First for an "installment contract" on Schedule F.

As stated before, this version of events is vehemently disputed by the Defendant in several key respects. The Defendant testified that he attempted to pay $2,200 towards the $2,734.96 overdraft with his own funds from a paycheck and money in his wallet but that the Plaintiff refused anything less than full payment of the overdraft. He also testified that officers of the Plaintiff frequently harassed him about the overdraft via phone calls to his office that threatened his employment and even phone calls to his apartment late at night, which contradicts collections manager Kelly Vigil's testimony that the Plaintiff's employees are not permitted to work after 7:00 p.m. The Defendant's mother Marlene Hinckley had two vehicles at the time, a 1989 Oldsmobile Cutlass and a 1991 Cadillac DeVille, but she was having "mechanical problems" with the Cadillac. Because of the Plaintiff's actions and Mrs. Hinckley's difficulties with her Cadillac, the Defendant decided to pay off the entire Car loan along with the overdraft with his $2,200 combined with $11,000 loaned to him by Mrs. Hinckley. According to Mrs. Hinckley, the intent was that the Bravada would be "technically" hers until the Defendant could pay her back.

Mrs. Hinckley had $9,948 in a safe in her home in Idaho Falls, Idaho, to which she added the difference from other money available to her for a total of $11,000. She then drove from Idaho Falls to the Defendant's apartment in Ogden on January 11, 2006 with a money bag containing the $11,000. The Defendant and Mrs. Hinckley counted the money, all of which was in $100 bills, and sorted it into $1,000 bundles before placing the money back into the money

bag and driving together to the Plaintiff's Riverdale office. No explanation was ever offered as to how the entirety of Mrs. Hinckley's $11,000 got turned into $100 bills given that the money came from at least two sources totaling $9,948 and $1,052, respectively.

While Mrs. Hinckley stayed in the car, the Defendant and Ms. Wright counted the money together in the Plaintiff's office. Ms. Wright took the $13,200 in the money bag elsewhere in the office and returned with change of $4.28 along with the Loanliner Security Agreement and the Open-End Plan Signatures form but not the Account Closure Form. The Defendant signed these documents without reading them, and their contents were not explained to him other than Ms. Wright's assertions that the Loanliner Security Agreement was a receipt for the loan payoff and that the Open-End Plan Signatures form evidenced cancellation of the Defendant's disability insurance. Ms. Wright also informed the Defendant that he would be receiving the Car's title within 30 days.

When the Defendant returned to the car, he showed Mrs. Hinckley (and perhaps obtained from the Plaintiff) only the Loanliner Security Agreement. She asked him whether he wanted to go back inside to get an "actual receipt," but he told her that the Loanliner Security Agreement was the receipt that he was given and would suffice until he obtained more complete paperwork. The Defendant testified that he had no reason to question the documents at the time given Ms. Wright's representations and the fact that he received the same documents in an earlier payoff of his Dodge Durango loan with the Plaintiff. On cross-examination, the Defendant first testified

that he only went into the Plaintiff's Riverdale office on January 11 but then testified that he also went in on January 13 after getting a call that he needed to sign the Account Closure Form.[8]

The Defendant did subsequently take checks of $250 each to the Plaintiff's Riverdale office at the end of January and February, respectively, with the intent that they be deposited into his savings account toward repayment of Mrs. Hinckley's $11,000 loan, and he instructed the teller accordingly both times. The Defendant alleged that he had another checking and savings account with the Plaintiff other than the ones closed in connection with the Account Closure Form. The teller rather than the Defendant wrote the account number on the January check. The Defendant ceased making deposits into his savings account for repayment of the Car loan once he transferred the Car's title to his mother in March.

The Bravada went back and forth between the Defendant's possession in Utah and Mrs. Hinckley's possession in Idaho after the January 11 payoff. According to Mrs. Hinckley, the Defendant drove her 1989 Oldsmobile Cutlass during the time that she had the Bravada. The Bravada was in the Defendant's possession in Utah when Mr. Snyder attempted to repossess it. The Defendant admits that the front right side of the car was damaged when he drove away and that he had a flat tire but insists that the Car was not on Mr. Snyder's lift when he got into it. The Defendant also testified that the additional damage to the Car seen by Mr. Snyder in Idaho on September 6, 2007 (and even more damage that he did not see) was the result of vandalism while the Car was in Utah again, possibly by Mr. Snyder himself in an attempt to steal the Car,

---

[8] Collections manager Kelly Vigil's testimony about her efforts to look for possible misapplication of the Defendant's payoff money to other America First accounts was somewhat unclear. She first testified that she looked for any such transactions dated January 13, but then stated that she "would have been looking for anything in that area of those transactions" to include January 11.

although the timing of these events is unclear and the alleged police report of the incident was not offered into evidence. The Defendant offered no admissible evidence as to the value of the Car.

## II. DISCUSSION

Section 523(a)(6) excepts debts from discharge "for willful and malicious injury by the debtor to another entity or to the property of another entity," and the Plaintiff must prove that the alleged injury was both willful and malicious by a preponderance of the evidence.[9] As the United States Supreme Court has explained, "[t]he word 'willful' in [§ 523](a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury."[10] The Plaintiff can establish that the injury was willful either by direct evidence or by showing that the Defendant had knowledge of the Plaintiff's lien rights and knowledge that his actions would cause an injury to those rights.[11] Therefore, in order to establish that the injury was willful, the Plaintiff must show that the Defendant knew of and intended to cause an injury to either the Plaintiff or its property rights. To prove malice, the Plaintiff does not need to show "ill will or spite," just that the Defendant's actions were "without justification or excuse."[12]

The tort of conversion has long been considered a sufficient basis for a § 523(a)(6) complaint in appropriate circumstances. "Conversion of property consists of an intentional

---

[9] *Mitsubishi Motors Credit of Am., Inc. v. Longley (In re Longley)*, 235 B.R. 651, 655 (10th Cir. BAP 1999) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

[10] *Kawaauhau v. Geiger (In re Geiger)*, 523 U.S. 57, 61 (1998) (emphasis in original).

[11] *Longley*, 235 B.R. at 657.

[12] *Am. First Credit Union v. Gagle (In re Gagle)*, 230 B.R. 174, 183 (Bankr. D. Utah 1999).

exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel. . . . But a willful and malicious injury does not follow as of course from every act of conversion, without reference to the circumstances. There may be a conversion which is innocent or technical, an unauthorized assumption of dominion without wilfulness [sic] or malice."[13]

**A.    Willfulness**

In this case, although the Plaintiff's practice of posting transactions before underlying documents are executed and the failure of communication among departments about title retention leave something to be desired, the Court finds that the testimony of the Plaintiff's witnesses is credible and comports with the admitted documentary evidence. The Defendant clearly overdrafted his checking and savings accounts based on the counterfeit money orders and was unable to pay the money back immediately. As indicated on the Applicant Worksheet for the new loan initiated on January 6, 2006, the Defendant expressed a desire to add the overdraft amount to the existing Car loan, and closure of the overdrafted checking and savings accounts was a prerequisite to the Plaintiff's consent to such a transaction. Then on January 13, the Defendant executed the Loanliner Security Agreement, Open-End Plan Signatures form, and Account Closure Form in person at the Plaintiff's office, with the Account Closure Form indicating his desire to close his only checking and savings accounts with America First as contemplated by the conditions of the refinance.

---

[13]     *Id.* at 181 (internal quotes and citations omitted).

The Loanliner Security Agreement indicated that the Bravada is serving as security for the refinanced loan and that the Defendant "promise[d] not to sell or lease the property or to use it as security for a loan with another creditor until the advance is repaid." The Defendant also promised to allow no other security interests or liens to attach to the Bravada, to have the Plaintiff's security interest noted on the Car's title, and to notify the Plaintiff of any change in the address where the Car is kept with failure to keep any promise in the Security Agreement constituting an event of default entitling the Plaintiff to take possession of the Car.

The new Car loan payments were $252/month as initialed by the Defendant on the Loanliner Security Agreement after recalculation to include the requested disability insurance, and the Defendant subsequently made two payments of $250 each at the end of January and February, respectively. And the checks were made out to America First with a notation in the memo line of the January check indicating that it was for the February car payment rather than a deposit into the Defendant's nonexistent savings account, regardless of whether the Defendant or the teller wrote the main Car loan account number on the January check.

In contrast, the Court's careful study of the Defendant's demeanor on the stand coupled with the substantive content of his testimony leads the Court to the conclusion that much of his testimony is simply not credible. All of the documentary evidence from before, on, and after the critical dates of January 11 and January 13 and all of the testimony by the Plaintiff's witnesses indicate that the transaction was a refinance and not a payoff. The creation of the Applicant Worksheet on January 6 containing financial information about the Defendant and the accompanying comments by Tara Wright contemplate a rollover of the overdraft debt into the Car loan. The Loanliner Security Agreement and the Open-End Plan Signatures form were

initialed by the Defendant to indicate his acceptance of the disability insurance inclusion into his new Car loan payments of $252/month and signed. The Account Closure Form does include a notation saying that the Defendant "has 2 accounts," but the only America First account numbers for the Defendant in the record of this case are 2262363-1 (which consisted of the Defendant's closed checking and savings accounts) and 2238746-8 (which consisted of the Defendant's vehicle loan accounts).

The Defendant's alleged nonchalance about the contents of the documents that he signed without reading them is particularly incredible in light of the purported harassment that he received from America First about the overdraft, and no believable basis for the Defendant's understanding of those documents has been provided even accounting for a relative disparity in sophistication between the parties. Equally incomprehensible is the Defendant's alleged maintenance of at least another checking and savings account with America First after the payoff given his dissatisfaction with America First that triggered a full payoff in the first place. The Defendant's testimony about his "payoff" of the Dodge Durango loan, his first vehicle loan through America First, is also inconsistent with the documentary evidence which shows that the Defendant used the Durango as a trade-in against the purchase price of the Bravada. So the Defendant's receipt of similar documents such as the Loanliner Security Agreement when he "paid off" the Durango loan is not plausible evidence of his stated belief that the Loanliner Security Agreement was a receipt for his payoff of the Bravada, because the transaction involving the Durango was also not a payoff of the type envisioned here. The Defendant also continued to drive the Car at times after the payoff and transfer of title to Mrs. Hinckley. A final curiosity involves the Defendant's listing of America First as a general unsecured creditor on

Schedule F for an "installment contract" debt of $13,197 — almost the exact principal amount of the refinanced obligation. If he actually believed that the Car loan had been paid off, then there would have been no reason to list America First as a creditor with a claim that could potentially be discharged. An argument could be, but was not, made that the Defendant only listed America First on Schedule F in an abundance of caution, but that would still leave the Defendant's failure to list the transfer of the Car to his mother on the Statement of Financial Affairs unexplained.

Even assuming *arguendo* that the Defendant did enter the Plaintiff's Riverdale office with a money bag containing $13,200 and did come out with $4.28 in change on either January 11 or January 13, the Court does not find credible the Defendant's story as to the disposition of that money or his alleged understanding of the signed documents. As such, the Court finds that the Defendant knew of the Plaintiff's lien rights on the Bravada, intended to injure those rights, and committed the tort of conversion when he transferred the Car to his mother. He acted willfully for the purpose of § 523(a)(6).

**B.      Malice**

The Court also finds that the Defendant's actions were without justification or excuse and therefore satisfy the malice element of § 523(a)(6). The Defendant alleges several related yet specific reasons in support of his justification defense, but none of them are availing. First, the Defendant contends that the refinance agreement was not explained to him and that he did not understand what he was signing on January 11, 2006. The Court has already addressed this purported basis for justification and found no documentary evidence and no credible testimony to support the Defendant's proffered excuse based on his lack of knowledge about the refinance agreement or his obligations under that agreement.

Second, the Defendant essentially makes an argument based on consent as a result of the Plaintiff's erroneous release of the Car's title to the Defendant. The Defendant argues that he reasonably believed that the Car was his free and clear and was not surprised to receive the Car's title given his alleged payoff of the debt. It is true that consent constitutes a valid defense to a tort and is described as such in the Restatement of Torts: "(1) Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor. (2) If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact."[14] It is also true that at least one court has found a debt dischargeable when a creditor erroneously released the title on a pickup truck to the debtor.[15] But even in that case, the court's holding was based on a course of dealing between the parties and a review of the totality of the circumstances. As applied to this case, the legitimacy of the Defendant's second consent-based excuse relies on the Court's acceptance of his initial excuse — namely, that the loan was paid off and that he did not realize what documents he was signing. But again, the Court has already rejected the Defendant's version of events and, therefore, those alleged events can provide no basis for a finding of America First's actual consent or even apparent consent based on a reasonable belief by the Defendant that America First was relinquishing its security interest in the Car.

Third, the Defendant argues that even if he did knowingly sign the Loanliner Security Agreement, the Plaintiff's security interest in the Car was unperfected because of the title release

---

[14]    RESTATEMENT (SECOND) OF TORTS § 892.

[15]    *See East Idaho Fed. Credit Union v. Thomason (In re Thomason)*, 225 B.R. 751 (Bankr. D. Idaho 1998); *see also Spokane Railway Credit Union v. Endicott (In re Endicott)*, 254 B.R. 471 (Bankr. D. Idaho 2000).

and, therefore, the Plaintiff's debt was discharged in the Defendant's main bankruptcy case. The major flaw in this argument is the conflation of the concepts of securitization and perfection. Even assuming that the Plaintiff's lien on the Bravada was unperfected as of the petition date, the underlying Security Agreement was still valid as between the Plaintiff and the Defendant when it was executed in January 2006. In contrast, "[p]erfection of a claim is relevant only to the debt's priority in relation to third parties. . . ."[16] The great majority of cases that have addressed this issue have recognized the distinction and have held that conversion of an unperfected security interest can support a ruling of nondischargeability on a § 523(a)(6) complaint.[17] This Court agrees with those decisions and holds that the Plaintiff's failure to perfect its security interest under the circumstances of this case does not constitute a valid justification for the Defendant's conduct.

**C.   Damages**

Finally, "the measure of damages for conversion is the value of the converted property at the time of conversion," except that when "the balance due on the Loan is less than the value of the converted collateral, [the Plaintiff's] damages are limited to the lesser of the value of the converted property or the amount of the indebtedness."[18] Although the evidence presented in support of valuation is somewhat questionable, it is undisputed by any admissible evidence and the Court accordingly finds that the value of the Bravada on the date of conversion was $16,125. Ms. Vigil testified for the Plaintiff that the Car loan payoff as of the November 16, 2007 trial

---

[16]   *General Motors Acceptance Corp. v. Dotson*, 155 B.R. 389, 390 (W.D. Va. 1993).

[17]   *See, e.g.*, *id.* (collecting cases); *People's Savings Bank of Brockton v. Cardillo (In re Cardillo)*, 39 B.R. 548 (Bankr. D. Mass. 1984).

[18]   *Gagle*, 230 B.R. at 184.

date was $16,540.93. But the relevant date is the date of conversion, and the only specific date before the Court is the March 14, 2006 issue date of the Idaho title on the Car in Mrs. Hinckley's name. Based on the Plaintiff's own record of the Defendant's Car loan account that was admitted into evidence, the balance due on the refinanced obligation as of March 6, 2006 was $12,894.51.[19] Accordingly, the Court finds that the Defendant's actions caused damages to the Plaintiff in the amount of $12,894.51. No attorney's fees or costs were requested, and none are awarded.[20]

### III. CONCLUSION

For the reasons set forth above, the Court finds that the Defendant committed the tort of conversion, that the Defendant knew of the Plaintiff's lien rights when he did so, and that he intended to injure the Plaintiff's lien rights by transferring the Bravada to his mother. The Court also finds that the Defendant's actions were without justification or excuse. Based on the undisputed evidence before the Court, the Court further finds that the Defendant's actions caused damages to the Plaintiff in the amount of $12,894.51, which is less than the $16,125 value of the Bravada on the date of conversion. Accordingly, the Court holds that the $12,894.51 debt to the Plaintiff is nondischargeable under § 523(a)(6), and a separate Judgment to that effect will be issued.



------------------------------END OF DOCUMENT------------------------------

---

[19] The March 6, 2006 entry in the Plaintiff's record of the Defendant's loan account is the last one before the March 14, 2006 issue date of the Idaho title on the Car in Mrs. Hinckley's name. The next entry modifying the Car loan balance is dated April 5, 2006.

[20] *Id.* at 184-85.

_____ooo0ooo_____

SERVICE LIST

Service of the foregoing **MEMORANDUM DECISION** will be effected through the Bankruptcy Noticing Center to each party listed below.

Timothy W. Blackburn
2404 Washington Blvd. #900
Ogden, UT 84401
    *Counsel for Plaintiff*

Jerald N. Engstrom
2568 Washington Blvd.
Suite 200
Ogden, UT 84401
    *Counsel for Defendant*